Paul R. ROSEN, esq., et al., Appellant,

v.

NATIONAL LABOR RELATIONS
BOARD, et al.

No. 83–1226.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 13, 1983.

Decided May 18, 1984.

As Amended June 6, 1984.

Paul R. Rosen, Philadelphia, Pa., of the Bar of the Supreme Court of Pennsylvania, pro hac vice by special leave of the Court, for appellants; Daniel J. Dugan, Philadelphia, Pa., was on brief for appellants.

Edward S. Dorsey, Atty., N.L.R.B., Washington, D.C., for appellees; Margery E. Lieber, Deputy Asst. Gen. Counsel, Washington, D.C., was on brief, for appellees.

Before WALD and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

Paul R. Rosen, a member of the Pennsylvania Bar, and the Philadelphia law firm of which he is a partner, Spector, Cohen, Gadon, and Rosen ("Spector, Cohen"), brought a civil action against the National Labor Relations Board ("NLRB" or "Board") and its executive secretary, John Truesdale, seeking relief from a finding by an Administrative Law Judge that Mr. Rosen had suborned perjury. In their complaint, plaintiffs alleged that this finding violated their due process rights inasmuch as they had no opportunity to present evidence at the hearing—or thereafter—on Mr. Rosen's behalf. Their prayer for relief sought, among other things, that the administrative finding be declared void and that the NLRB be required to hold a hearing to allow Mr. Rosen to clear his name. The District Court dismissed the suit on several grounds, namely that the plaintiffs had failed to invoke available administrative procedures adequate to protect their rights; that the action was an improper collateral attack on an NLRB proceeding; and that the action was barred by the doctrine of judicial immunity. For the reasons that follow, we affirm.[1]

**1.** We dispose of both Mr. Rosen's and Spector, Cohen's claims, which are essentially the same, on identical grounds. For convenience and

## I

This case had its genesis in a 1978 attempt by a labor union to organize the warehouse employees of Feld and Sons ("the Company"), a Pennsylvania textile concern also known as "Today's Man," the name which adorns the NLRB administrative proceedings that figure prominently in the backdrop of this case. Following a representation election, the union sought certification as the warehouse employees' collective bargaining representative. At the same time, the union filed unfair labor practice charges alleging, *inter alia*, that the Company had dismissed certain employees for pro-union activities. *Today's Man*, 263 NLRB 332, 334 (1982).

At an administrative hearing on the two issues of certification and unfair labor practice charges, the Company was represented by the Philadelphia law firm of Pechner, Dorfman, Wolffe, Rounick & Cabot ("Pechner, Dorfman"). Mr. Rosen and his firm had not yet joined the cast in this unfolding drama, although Spector, Cohen was at all relevant times serving as the Company's corporate counsel.

During the course of the administrative hearing on the issue of union certification, NLRB representatives became convinced that various representatives of the Company, including its president, Mr. Feld, and two Pechner, Dorfman attorneys had committed perjury or subornation of perjury. In accordance with Board procedures in such instances, the NLRB Regional Office in Philadelphia prepared a memorandum for the Board's General Counsel in Washington outlining the facts and recommending that the matter be referred for possible prosecution to the United States Attorney for the Eastern District of Pennsylvania. 263 NLRB at 334.

In October 1978, Pechner, Dorfman tried to settle the unfair labor practice charges. Although the possibility of resolving the perjury charges was raised during the course of settlement negotiations, NLRB

brevity, we sometimes refer in our opinion simply to Mr. Rosen's claims.

representatives indicated to the Pechner, Dorfman attorneys that any settlement of the unfair labor practice charges would *not* include any agreement not to bring perjury charges. 263 NLRB at 335–336. The Pechner, Dorfman attorneys thereafter reached a formal settlement agreement with the NLRB on the unfair labor practices, which Mr. Feld, as president, signed on behalf of the Company. After approving the settlement in January 1979, the NLRB petitioned the Third Circuit Court of Appeals for enforcement of the agreed-to order as part of the settlement.

Between the time of settlement and the time the Board sought enforcement, a major substitution occurred in the *dramatis personae*. The Company engaged Mr. Rosen's firm, already ensconced, as we have seen, as corporate counsel, to represent it in the NLRB matter. With Spector, Cohen now substituted in as counsel, the Company objected to the NLRB's enforcement petition on the ground that the settlement agreement should be set aside. The Company alleged that an oral side agreement existed by which the NLRB had agreed not to press the perjury charges against Mr. Feld and the Pechner, Dorfman attorneys. Furthermore, the Company alleged that this agreement created a conflict of interest between Pechner, Dorfman and the Company by implanting an interest on the part of the Pechner, Dorfman attorneys in persuading the Company to acquiesce in the settlement agreement. The Company and the NLRB thereupon agreed to a limited remand before Administrative Law Judge Donnelly for the purpose of adducing evidence concerning the negotiations and execution of the settlement agreement to determine whether the settlement in fact included the alleged side agreement to drop the perjury charges. The die was thus cast for the unhappy events which brought about the action now before us.

Mr. Rosen represented the Company in this second, limited hearing before the ALJ. The principal witnesses were the Pechner, Dorfman attorneys and the Board representatives involved in negotiating the original settlement. In response to questions from Board counsel, a Pechner, Dorfman attorney, Barry Bevacqua, testified about a meeting with Mr. Rosen at Philadelphia's Locust Club in March 1979. ALJ Trial Transcript at 818. Mr. Rosen promptly objected to this line of questioning on relevancy grounds, contending that inasmuch as the Locust Club meeting had occurred after the settlement, the meeting simply could not bear on the scope of the settlement. *Id.* at 822. Judge Donnelly overruled the objection.

With the evidentiary door now open, not only Mr. Bevacqua but two other Pechner, Dorfman attorneys, namely Martin Sobol and Julius Steiner, testified about their conversations with Mr. Rosen concerning the scope of the original settlement. The Pechner, Dorfman lawyers testified, in essence, that at the Locust Club conclave Mr. Rosen had advanced a theory of the case which would have barred perjury charges being brought against Mr. Feld and certain Pechner, Dorfman attorneys. Under Mr. Rosen's theory, the NLRB representative who negotiated the settlement had expressly agreed to resolve the perjury charges as part of the original settlement and thus wash out any lingering perjury or subornation issues.

Mr. Bevacqua testified that in response to Mr. Rosen's articulation of this theory, the Pechner, Dorfman attorneys demurred on the grounds that Mr. Rosen's theory did not square with the facts. Mr. Rosen, according to Mr. Bevacqua's testimony, thereupon reminded them that he had statements from witnesses and "control over them" and that his theory "was a viable way to get the whole thing put to bed." *Id.* at 827 (testimony of Mr. Bevacqua). Mr. Sobol, another Pechner, Dorfman attorney, similarly testified that Mr. Rosen had opined that unless Mr. Sobol testified to facts supporting the foregoing theory, some Pechner, Dorfman attorneys would be disbarred and two of those attorneys would find themselves behind bars. *Id.* at 1991–94 (testimony of Mr. Sobol). According to Mr. Sobol, Mr. Rosen reiterat-

ed that he controlled the relevant witnesses. *Id.* [2]

Upon concluding the hearing, Judge Donnelly found in a written opinion that Mr. Feld, the president of the Company, knew that the settlement of the unfair labor practice charges did not in fact include an agreement to drop the perjury charges. In part, Judge Donnelly reached this conclusion because he expressly found as follows:

> Feld and Rosen attempted to induce the Pechner attorneys to fabricate testimony to the effect that [the NLRB representative] had agreed to include perjury allegations in the settlement. During these conversations Feld acknowledged the falsity of such testimony, but felt that it was his only chance on the perjury matter. Apart from this as a reprehensible attempt to subvert justice, it also constitutes an acknowledgement by Feld that he was aware that the settlement did not dispose of the perjury matter.

*Today's Man,* 263 NLRB at 338. The ALJ based his finding that Mr. Rosen "attempted to induce" the Pechner, Dorfman attorneys to testify falsely upon the latter's testimony about the Locust Club meeting.[3]

While Judge Donnelly's decision was under review by the Board, Mr. Rosen asked Mr. Dunham, another attorney at the Spector, Cohen firm, to consult with Chief Administrative Law Judge Welles of the NLRB as to the manner in which his "personal concern" could be expressed about the ALJ's findings without having the communication viewed as *ex parte. See* Letter from Mr. Dunham to NLRB Secretary Truesdale (March 30, 1982). R. 11. According to Mr. Dunham, Judge Welles suggested that a letter be sent directly to Judge Donnelly. Accepting this advice,

Mr. Rosen accordingly wrote to Judge Donnelly requesting him "to modify his decision [and] delete the language referring to my conversation with the Pechner attorneys at the Locust Club." *See* Letter from Mr. Rosen to ALJ Donnelly (Dec. 31, 1981). R. 6. Judge Donnelly forwarded this letter to Mr. Truesdale, the Board's executive secretary, who thereupon treated it as an *ex parte* communication and forwarded copies of it to all parties to the *Today's Man* proceeding for comment.

In its decision affirming Judge Donnelly's ruling in this second hearing, the Board denied Mr. Rosen's request for deletion of the offending language. The Board did not, however, impose any penalty upon Mr. Rosen for dispatching a communication treated by the Board as *ex parte. Today's Man,* 263 NLRB at 334. The Third Circuit on January 7, 1983, entered a consent judgment enforcing the Board's order.

Meanwhile, on August 23, 1982, Mr. Rosen and the Spector, Cohen firm filed the instant suit, alleging that the ALJ's "vilification" violated their due process rights under the Fifth Amendment and the Administrative Procedure Act. Their request for relief included a declaration that the ALJ's findings violated their Fifth Amendment rights and an injunction to require the NLRB to afford Mr. Rosen a hearing in which he could adduce evidence to contest Judge Donnelly's findings.

On January 27, 1983, the District Court, setting forth three separate grounds, granted the Board's motion to dismiss. First, the court concluded that no APA or due process rights were violated because Mr. Rosen in fact had an opportunity to intervene in the administrative proceeding

---

**2.** Mr. Steiner testified to the same effect. *Id.* at 2066.

**3.** The ALJ set forth the following specific findings concerning Mr. Rosen:

> Rosen made a similar effort [to try to influence the Pechner attorneys' testimony] in March 1979, in a meeting at a local restaurant when he proposed to a group of Pechner attorneys, including Sobol, Steiner, Bevacqua, and Leonard Schaeffer, a scenario of events

> to defend the perjury case, which included testimony by the Pechner attorneys to the effect that [the NLRB representative] had agreed to include the perjury matter in the Settlement Agreement. Sobol told him that it did not happen that way, whereupon Rosen told him that he controlled certain witnesses and that if the attorneys did not cooperate, Steiner and Dabrow were going to jail.

*Today's Man,* 263 NLRB at 337.

before Judge Donnelly despite the attorney-client relationship with the Company. The District Court based this first conclusion on the premise that the testimony of the Pechner, Dorfman lawyers created a conflict of interest such that Mr. Rosen's withdrawal was permissible if not mandated under Disciplinary Rules 2–110(B)(2), 5–101(B) and 5–102(A). The court stated in this respect that if Mr. Rosen had withdrawn as counsel, the Board's rules and regulations clearly allowed him to move "to intervene, thus placing himself in a position to testify as to facts underlying the findings he now challenges." Memorandum Opinion at 567. The District Court further concluded that the attorney-client privilege would have been no bar to Mr. Rosen's testifying, since Disciplinary Rule 4–101(C) does not prevent a lawyer from revealing confidences to defend himself against "an accusation of wrongful conduct."

Second, the District Court concluded that a collateral attack on the Board's finding was unwarranted in view of the availability of direct review in the Court of Appeals under section 10 of the National Labor Relations Act. *See* 29 U.S.C. 160(f) (1973). Finally, the court found that judicial immunity prohibits an injunction against an agency on behalf of a non-party aggrieved by what the agency has done or said in the course of a quasi-judicial proceeding. This appeal followed.

## II

■ The Government argued below that no constitutionally mandated hearing was required because, under *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), an alleged defamation does not deprive Mr. Rosen or his firm of a liberty interest protected under the Due Process Clause. We assume without deciding that Mr. Rosen and his law firm were deprived by the alleged defamation of a liberty interest cognizable under the Due Process Clause.[4] We nonetheless conclude that, under the circumstances of this case, Mr. Rosen is not entitled to a collateral hearing.[5] The orderly processes of justice do not require and indeed should not permit a non-party to obtain as of right a collateral rehearing in an effort to alter the findings of a neutral trier of fact, when, as here, the non-party in his role as an advocate represented a party at the original hearing and the party had an interest in rebutting the factual findings adverse to the non-party.[6]

---

**4.** The circumstances relevant to the *Paul v. Davis* issue are not at all clear on this record, inasmuch as Mr. Rosen maintains that far more than injury to reputation *simpliciter* is at stake. He contends, for example, that by virtue of the ALJ's adverse statements, disabilities are now imposed upon him with respect to qualifying for state and local bar association offices in Pennsylvania. Inasmuch as no findings were made below on these issues, we address Mr. Rosen's due process claims by assuming, without deciding, that injury beyond reputation alone has been sustained in this case.

**5.** In addition to asking for a hearing, Mr. Rosen also requests that we declare that the part of the ALJ's opinion relating to him is erroneous. A hearing, however, would plainly be required to decide whether such relief would be appropriate and justified. Thus, Mr. Rosen's request for a declaration presupposes his request for a collateral hearing.

**6.** We assume, but only for the purposes of this section, *see* part III, *infra,* that while Mr. Rosen had a formal opportunity for intervention under 29 C.F.R. § 102.29 (1982), he had no effective opportunity because he could not withdraw as counsel and intervene in his client's proceeding. We do not, of course, hold here that in order to satisfy the requisites of due process a system of adjudication must give a non-party even a formal opportunity of intervention to protect against possible adverse comment. Whether a formal opportunity to intervene in order to protect one's reputation from adverse judicial comment is a necessary requisite of due process is in itself a substantial question. The number of individuals in virtually any proceeding who might be adversely commented upon is potentially large and includes all witnesses whose testimony the judge may find untruthful. The "public interest in preventing a lawsuit from becoming complex or unending" would seem to militate against such a due process requirement. *See Smuck v. Hobson,* 408 F.2d 175, 179 (D.C. Cir.1969) (interpreting scope of intervention under Fed.R.Civ.P. 24).

## A

In deciding what process is due Mr. Rosen and his law firm, we must determine what fundamental fairness requires in the light of "history, reason, [and] the past course of decisions." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162–163, 71 S.Ct. 624, 643–644, 95 L.Ed. 817 (1951) (Opinion of Frankfurter, J.). In evaluating whether fairness requires a particular procedure such as a collateral hearing in this particular context, we must consider various factors, including (1) the importance of the private interest at stake; (2) the likelihood that additional process would correct error; and (3) the burden which the additional process would impose on the government.[7]

In this case, the private interest to be protected is essentially an interest in reputation.[8] Reputational interests are clearly important, *but see Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *but cf., e.g., New York Times v. Sullivan*, 376 U.S. 254, 259, 84 S.Ct. 710, 714, 11 L.Ed.2d 686 (1963) (balancing the interest in an individual's reputation against the public interest in First Amendment expression), as evidenced by their historic protection at common law.[9] However, the individual interest in reputation is not the sole factor in the calculus. For the fundamental reasons that, as are more fully elaborated below, collateral hearings in these circumstances would not greatly increase the likelihood of correcting erroneous adverse judicial comments and because such hearings would impose additional burdens impeding orderly judicial procedures, we decline to create any additional protections for either Mr. Rosen or the law firm beyond the process already provided. This process consisted of an adversary proceeding conducted before the unbiased tribunal that an administrative law judge affords.[10] Furthermore, Mr. Rosen, albeit not formally a party before the tribunal, in fact conducted his client's representation before

---

7. In *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the Supreme Court set out a similar calculus to determine whether additional administrative procedures were needed to protect property interests under the Due Process Clause. The Court considered:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

The Supreme Court has also balanced these factors in considering what process is due a liberty interest. *See Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).

8. Of course, to avoid the holding of *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), appellants must allege the invasion of other legally cognizable interests which, when conjoined with appellant's interest in reputation, suffice to state a claim of deprivation of a liberty interest under the Due Process Clause. *See Mosrie v. Barry*, 718 F.2d 1151, 1159 (D.C. Cir.1983). *See also* Monaghan, *Of "Liberty" and "Property,"* 62 Cornell L.Rev. 405, 427 (1977) (discussing "reputation-plus" interests that *Paul v. Davis* acknowledged were protected under the Due Process Clause but which, absent an interest in reputation, would not support a due process claim). However, appellants have not alleged an invasion of an interest which, when taken *independently* of their interest in reputation, would support a due process claim.

9. This interest in reputation is, of course, more diffuse and less tangible than the interest in preventing a direct loss of a monetary entitlement or a direct loss of liberty in the form of a criminal conviction.

10. The requirement of an unbiased tribunal is fundamental to due process. *See Ward v. Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (holding that a mayor could not judge traffic offenses where the major portion of his village's income was from the fines, fees, and costs imposed in the mayor's courts). *See generally* Friendly, *Some Kind of Hearing*, 123 U.Pa. L.Rev. 1267 (1975). Judge Friendly suggests that insofar as a tribunal is unbiased, other requirements of due process may be less important. It should be noted that in cases in which the Supreme Court has found a deprivation of a reputational interest to be a violation of due process, the deprivation was not accomplished by unbiased tribunals. *See, e.g., Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (police chief decided to post a notice which prevented petitioner from buying liquor).

the tribunal and had proxy representation, as it were, through his client.[11]

The likelihood that a further collateral hearing will reduce the risk of erroneously adverse judicial comment in such circumstances is quite small. At the *original hearing,* the Company which Mr. Rosen represented had a clear interest in rebutting the testimony that its lawyer was trying to suborn perjury. Indeed, in furtherance of this interest the Company through Mr. Rosen vigorously exercised its right of cross-examining the Pechner, Dorfman attorneys about what transpired at the Locust Club meeting. *See* ALJ Trial Transcript at pp. 819, 2033, 2066. Therefore, Mr. Rosen had in his client a proxy enjoying a full panoply of due process rights and armed with a keen interest in preventing a finding of fact that was adverse to itself as well as to Mr. Rosen. Second, because of important safeguards built into a mature system of administrative or judicial adjudication, such as the impartiality of the trier of fact, erroneous adverse comments will likely be rare.[12]

We turn, then, to the governmental interest in avoiding collateral hearings. In this branch of the inquiry, we seek to assay whether the value of those few instances in which more focused fact finding will likely vindicate a non-party's interest in reputation is outweighed in the circumstances before us by the disadvantages of collateral hearings. The most evident aspect of this interest, of course, lies in avoiding the imposition of yet another genre of hearings on already overburdened systems of adjudication in this country. But more than mere added burden is involved here. An adjudicatory system, whether it be courts or administrative agencies, has a powerful interest both in encouraging judges to engage in full, vigorous fact-finding and in ensuring the finality of judgments.

■ Complete and vigorous fact-finding is at the heart of the adjudicatory process. Indeed, the Supreme Court has recognized the ancient privilege of absolute immunity for judges to encourage "principled and fearless decision-making." *See Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967).[13] This immunity includes the absolute privilege to publish even defamatory statements in judicial opinions, so long as "the publication has some relation to the matter before [the judge.]" *See* Restatement (Second) of Torts § 585 (1977). *See also Lowenschuss v. West Publishing Co.,* 542 F.2d 180 (3d Cir.1976) (extending an absolute privilege to the *verbatim* republishing of judicial decisions by a private publishing concern).

11. While Mr. Rosen himself was not a party to the proceeding before the tribunal, he had virtual or proxy representation through the Company which had every interest in avoiding a finding adverse to Mr. Rosen's reputation that would serve as an evidentiary predicate for an adverse judgment against it. The combination of an unbiased tribunal and virtual representation gave Mr. Rosen far more due process protection than the Supreme Court has found sufficient in some contexts for the deprivation of a liberty interest. *See Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (holding that an informal, nonadversary evidentiary review before a committee of prison officials in a prisoner's absence protected the prisoner's due process interest in avoiding administrative segregation).

12. In *Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978), the Supreme Court stated that absolute immunity for administrative law judges is appropriate, stating that "because ... the judicial process tend[s] to enhance the reliability of information

and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error." Absolute judicial immunity applies both to suits by parties and non-parties. For a discussion of this subject of some considerable vintage, see Veeder, *Absolute Immunity in Defamation: Judicial Proceedings,* 9 COLUM.L.REV. 463, 486 (1909).

Of course, from the fact that erroneous adverse comments will likely be rare, it does not follow that few individuals in Mr. Rosen's circumstances would demand collateral hearings if they were available. Given an individual's interest in his or her reputation, and the intense skepticism with which individuals would likely view statements that reflect badly on themselves, many individuals might well resort to collateral hearings, if such a regime were available, even if there were ample grounds to support such statements.

13. Judicial immunity was one of the grounds for dismissal below. *See* Memorandum Opinion at 567.

While judicial immunity protects judges against damages actions and is thus not directly applicable to this case, the underlying rationale of the doctrine—to encourage "principled and fearless decision-making"— is strongly promoted by refusing to allow non-parties, in circumstances such as those before us, to mount collateral attacks against adverse comments in judicial or administrative proceedings. If judges were aware that adverse comments about a non-party would in all circumstances trigger the right to a collateral hearing, they might well circumscribe or soften their findings to avoid the burden of subsequent hearings. In a system of justice heavily reliant on evaluating and distinguishing precedent, it would be unfortunate indeed if the inhibitory influence of non-parties' demands for hearings were permitted to deter judges from setting forth in plain terms the full factual underpinning of their holdings. Moreover, a failure fully to state factual findings may make appellate review more difficult, particularly when the review is conducted on the basis of the substantial evidence standard.[14]

### B

■ Mr. Rosen argues, however, that his case is distinguishable from a garden-variety complaint by a non-party as to findings of fact because, in his view, Judge Donnelly's comments were irrelevant to the ultimate issue in the limited remand. He further contends, in distinguishing his case, that at the NLRB hearing it was impossible to introduce the rebuttal evidence because of the attorney-client privilege. *But see*

Part III, *infra.* Whether we agree that the testimony was relevant or not, the fact remains that the relevancy issue was squarely raised before Judge Donnelly and could thereafter have been litigated before the Board by the Company. Thus, the Company, serving as it were as Mr. Rosen's proxy, had the same interest in contesting the *relevancy* of the Pechner, Dorfman attorneys' statements as in contesting their *truth.*

Moreover, Mr. Rosen's objections to the unavailability of the evidence does not necessarily distinguish his case from the typical case of the non-party suffering from adverse comment. The attorney-client privilege is but one of several privileges that prevent parties themselves from adducing particular evidence, and thus create an obstacle to fact finding due to the broad judgment that the value of introducing such evidence is outweighed by the harm inflicted upon other policies and values. The explicit burdens imposed by such evidentiary rules have never, to our knowledge, been held inconsistent with due process in the civil law context, because such burdens are simply a necessary consequence of society's attempt to balance the value of the complete admissibility of probative evidence with other competing values, such as the protection of vital professional or associational relationships.

Because due process is, at bottom, informed by deep and abiding concerns for fundamental fairness to the party, *see Lassiter v. Department of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981), we are fortified in our

---

**14.** We note that Mr. Rosen's claim can be conceptualized as part of a larger genre of non-party complaints about adverse judicial comment. For instance, in a civil proceeding brought against a labor union in which it was argued that violence by union members had been directed against an employer, a district judge or administrative law judge would not unsurprisingly in such a hypothetical case identify which, if any, union officials had encouraged violence and which members had acted on their encouragement. Some of these union officials and members, however, might well not have been called as witnesses at trial and thus would have no notice that their conduct was at issue.

Like Mr. Rosen, they would have no effective right of intervention. Our holding here does not attempt to lay down a general rule for all such non-party complaints. Most non-parties are not likely to be, as Mr. Rosen was, in the position of conducting the representation of a party. Some non-parties may not have a party before the tribunal who functions as a proxy for their interests. Certain of the considerations discussed here, however, such as the government's interest in avoiding collateral hearings, would be relevant in determining what process is due any non-party who complains of adverse judicial comment.

conclusion in this case by the undisputed fact that, other than objecting to the damaging testimony on relevancy grounds, Mr. Rosen took no steps at all to bring his specific reputational concerns to the attention of the Administrative Law Judge. Admittedly, serious issues of professional ethics were raised by this testimony, as will be discussed in Part III, *infra*. Mr. Rosen therefore found himself in a most vexing situation, torn between fidelity to the cause of his client and the desire to clear his name.

This unhappy situation is all the more reason why Mr. Rosen should have taken some step to bring his dilemma to the attention of the presiding officer. Having failed to avail himself of any possible remedy that might have been fully efficacious, such as bringing to Judge Donnelly's attention his need to obtain authoritative advice—from the presiding judge himself, or from the Board, or from the Bar—Mr. Rosen and Spector, Cohen now seek at the eleventh hour to create an entirely new regime of procedural rights to collateral hearings. For the reasons already stated, this we decline to do.

## III

■ Even were we to agree that due process requires that Mr. Rosen have an effective right to contest Judge Donnelly's findings, we conclude that he had such a right in the form of a right of intervention in the Board proceedings under 29 C.F.R. § 102.29 (1982).[15] Having failed to exercise the right of intervention, Mr. Rosen and his firm have no grounds for advancing creative due process claims.[16]

Mr. Rosen strenuously argues that any theoretical right of intervention was rendered inefficacious by virtue of his bedrock obligation to continue to serve as attorney to his client. To the contrary, we conclude, as did the District Court, that under the specific circumstances presented here, he should have withdrawn from the case.

### A

The Code of Professional Responsibility, DR 5–102(A), provides:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall

---

**15.** 29 C.F.R. § 102.29 provides:

Any person desiring to intervene in any proceeding shall file a motion in writing or, if made at the hearing, may move orally on the record, stating the grounds upon which such person claims an interest. Prior to the hearing, such a motion shall be filed with the regional director issuing the complaint; during the hearing such motion shall be made to the administrative law judge. An original and four copies of written motions shall be filed. Immediately upon filing such motion, the moving party shall serve a copy thereof upon each of the other parties. The regional director shall rule upon all such motions filed prior to the hearing, and shall cause a copy of said rulings to be served upon each of the other parties, or may refer the motion to the administrative law judge for ruling. The administrative law judge shall rule upon all such motions made at the hearing or referred to him by the regional director, in the manner set forth in § 102.25. The regional director or the administrative law judge, as the case may be, may by order permit intervention in person or by counsel or other representative to such extent and upon such terms as he may deem proper.

**16.** Appellants argue that this opportunity for intervention was not sufficient to satisfy due process because the Board's denial of a motion to intervene would not have been subject to judicial review. Whether judicial review of an agency's decision to allow intervention to protect reputation is a necessary element of due process may well be doubted. There are various factors to be taken into account in deciding whether intervention to protect reputation is appropriate, *see supra* note 6; *see generally* Shapiro, *Some Thoughts On Intervention Before Courts, Agencies, and Arbitrators,* 81 Harv.L.Rev. 721 (1968), so that the decision may be thought best left to the discretion of the Administrative Law Judge and ultimately the Board. But regardless of the availability of judicial review *vel non,* the fact remains that appellants took no steps to avail themselves of an opportunity to be heard in the administrative proceeding. They should not, under those circumstances, be heard to complain that an administrative intervention procedure which they deliberately bypassed is constitutionally defective by virtue of the presumed absence of review by an Article III court.

withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in circumstances enumerated in DR 5–101(B)(1) through (4).

The rule is recognized as binding in this circuit. *See Groper v. Taff,* 717 F.2d 1415 (D.C.Cir.1983); *Permian Corp. v. United States,* 665 F.2d 1214 (D.C.Cir.1981); *United States v. Vereen,* 429 F.2d 713 (D.C.Cir.1970).

■ It is clear that, under the circumstances of this case, counsel "ought to have become a witness on behalf of his client" after the introduction of testimony about the Locust Club meeting. The Pechner, Dorfman attorneys, it will be recalled, testified that Mr. Rosen had tried to pressure them into testifying to falsehoods. As we have already seen, Mr. Rosen, when this testimony was first introduced, objected to it as irrelevant; the objection was, however, overruled. Judge Donnelly thus signalled quite clearly that he regarded this testimony as relevant to the question of the settlement's scope. The importance attached by Judge Donnelly to testimony concerning the Locust Club meeting is further attested to by his allowing in extensive testimony on this subject from not one but three Pechner, Dorfman attorneys.[17]

No one but Mr. Rosen and his associates could have rebutted what Judge Donnelly obviously regarded as relevant and damaging testimony. The testimony of Mr. Rosen and his associates became critical, and it was thus obligatory upon them "to place themselves on the witness stand in order to advance [the Company's case] completely and zealously...." *See Cossette v. Country Style Donuts, Inc.,* 647 F.2d 526, 530 (5th Cir.1981) (citations omitted). The fact that their testimony would be used as rebuttal testimony to the testimony of the General Counsel's witnesses, and not as part of the Company's case in chief, is irrelevant: "The Code makes no distinction as to whether [an attorney] acts as a witness in the case in chief or in rebuttal." *See J.D. Foley & Co. v. Vanderbilt,* 523 F.2d 1357, 1359 (2d Cir.1975). Since Mr. Rosen and members of his firm should have appeared as witnesses, they should have withdrawn from the case.

Moreover, it is clear that withdrawal could not have been avoided by the expedient of coming to an agreement with the client that Mr. Rosen and the firm should not withdraw. DR 5–102(A), unlike other rules in the Code of Professional Responsibility, *see, e.g.,* DR 5–101(A), makes no provision for client waiver of its application. Moreover, part of the underlying rationale for the rule, namely that a lawyer's serving in a dual role of witness and advocate is unseemly, is directed at the protection of the public interest in continued re-

---

**17.** The ALJ's inferences must have been as follows: from Mr. Rosen's attempts to pressure the Pechner, Dorfman lawyers into testifying that the representative of the General Counsel stated that the perjury charges were resolved, despite the Pechner, Dorfman attorneys' protestations that such testimony would be at variance with the facts, the ALJ inferred that Mr. Rosen was trying to get the Pechner, Dorfman attorneys to testify to something he knew was not the truth. In other words, Judge Donnelly *inferred* that Mr. Rosen believed that the perjury charges were not included in the settlement. The ALJ then inferred that Mr. Rosen's belief must reflect the belief of Mr. Feld, president of the Company, that the perjury charges were not included.

We in no manner endorse the validity of these inferences. In view of the fervor with which Mr. Rosen has maintained this action, the inferences may, in fact, be utterly at variance with reality. And, since the NLRB has tenaciously refused to provide Mr. Rosen with an administrative forum to clear his name, and instead has doggedly litigated this case in the federal courts for almost two years, the real facts as to Mr. Rosen's understanding and knowledge at the time of the Locust Club meeting will likely never be authoritatively known. We are accordingly moved, notwithstanding our affirmance of the adverse judgment below, to observe with considerable sympathy Mr. Rosen's efforts to vindicate his professional reputation and standing. Nonetheless, because Judge Donnelly entertained extensive testimony about the Locust Club meeting over Mr. Rosen's objections, Mr. Rosen was on notice that such inferences could be drawn.

spect for the legal profession rather than any waivable private interest.[18]

## B

■■■ We acknowledge that in the normal course an exception can be made to the requirement of withdrawal under DR 5–102 if withdrawal "would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm in the particular case." DR 5–101(B)(4). The District Court, to be sure, did not make any finding that a substantial hardship would not have been worked if Mr. Rosen withdrew. However, "a court need not treat the Canons of Professional Responsibility as it would a statute that we have no right to amend." See J.A. Foley & Co. v. Vanderbilt, supra, 523 F.2d at 1359 (Gurfein, J., concurring). Indeed, we think that under the particular circumstances of this case withdrawal was clearly called for, because the harm that Mr. Rosen would have caused his client in withdrawing was greatly outweighed by the harm to the client occasioned by his remaining in the case. Three Pechner, Dorfman attorneys had made serious allegations, under oath, which amounted to charging Mr. Rosen with attempting to suborn perjurious testimony.[19] This charge of criminal conduct, relating to the only issue with which the hearing before Judge Donnelly was concerned, gravely weakened Mr. Rosen's credibility as an

advocate. In such circumstances, the only proper course under the rationale of DR 5–102, including the exceptions to the rule, was withdrawal. In a word, the loss of credibility on the part of this attorney, who under the specific circumstances presented in this case ought to have become a witness, worked greater hardship on the client than would have the attorney's withdrawal.

Moreover, it is manifest that the damaging testimony in the administrative hearing gave Mr. Rosen a profound personal stake in the litigation, thereby creating a potential conflict of interest. While we realize that, under DR 5–101(A), the existence of a conflict of interest does not disable an attorney from representing a client, if the client consents after full disclosure to representation, we think that the deep-seated conflict of interest in this case strengthens our position, based upon DR 5–102(A), that Mr. Rosen and his firm should have withdrawn.

■■■ Finally, we stress the narrowness of our ruling as to when it becomes necessary for a lawyer to withdraw. Mere allegations of impropriety or even testimony of impropriety not central to the case should not require a lawyer to withdraw, for such a mandate could encourage ill-founded, tactically motivated charges of impropriety in the hope of forcing withdrawal. However, when testimony is adduced as to an attorney's misconduct of a potentially criminal

---

**18.** The policy rationale for DR 5–102 is articulated in Ethical Consideration 5–9 of the Code of Professional Responsibility:

Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when he also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of any advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.

**19.** Mr. Rosen argues that the Pechner, Dorfman attorneys' testimony could not amount to an allegation of suborning perjury, because there

was no testimony concerning his actual belief as to the scope of the settlement. While it is true that a necessary predicate of the charge of subornation of perjury is the suborner's belief that the testimony sought is in fact false, this belief can be and usually is inferred from the circumstances of the case. Here, the Pechner, Dorfman attorneys testified that they repeatedly told Mr. Rosen that the theory he was advancing did not fit the actual facts. Moreover, the Pechner, Dorfman attorneys would seemingly have had every interest in testifying the way Mr. Rosen suggested because such testimony would have given some of them an opportunity to avoid criminal charges. In the face of such circumstances, the Pechner, Dorfman attorneys' testimony detailing Mr. Rosen's persistent attempt to get them to testify to facts that fitted his theory left him vulnerable to the inference that he was suborning perjury.

nature which the trier of fact plainly views as relevant and important to the case and which only the lawyer (or members or associates of his firm) can rebut, we see no course of action other than withdrawal consistent with both the goals of securing fairness to the client and of maintaining public respect for the profession.

## C.

■■■ Appellants argue that, even if they could have withdrawn from the case, they could not have effectively testified because the president of the Company, Mr. Feld, refused to waive the attorney-client privilege. However, even assuming for the moment that Mr. Rosen and his associates could not have testified about their conversations with Mr. Feld, they clearly could have testified to the effect that by pressuring the Pechner, Dorfman attorneys at the Locust Club meeting, they were simply attempting to get the Pechner, Dorfman attorneys to tell what the Spector, Cohen lawyers sincerely believed to be the truth. That testimony would have severed a crucial link in Judge Donnelly's chain of inferences leading to his conclusion about Mr. Feld's knowledge of the scope of the settlement.[20]

In addition, and more fundamentally to the issue at hand, this testimony may have effectively rebutted the implication that Mr. Rosen was suborning perjury. It is, of course, true that if Mr. Rosen were asked the basis for his belief that an agreement not to bring perjury charges was included in the settlement, the client's refusal to waive the attorney-client privilege *might* have prevented Mr. Rosen from testifying about any conversations with Mr. Feld that formed the basis of this belief. However, while invocation of the privilege might have prevented Mr. Rosen from testifying as fully as he might have desired, he nevertheless could have rebutted the implication that he was trying to induce the Pechner, Dorfman attorneys to testify in a way he

knew to be false. Moreover, as we stated in part II, *supra*, the fact that some useful testimony is barred by a privilege simply has not been held to deny a litigant due process in a civil proceeding.

But it is by no means clear that Mr. Rosen could not in fact have testified about privileged communications under the circumstances of this case. If Mr. Rosen had withdrawn and intervened in the proceeding, he may very well have been able to testify as to matters otherwise protected by the attorney-client privilege. DR 4–101(C) provides that "a lawyer may reveal confidences or secrets necessary to establish and collect his fee or defend himself or his employees from an accusation of wrongful conduct." When a serious charge against an attorney arises out of his or her representation of a client, courts have allowed attorneys to disclose confidential information obtained from the client. In *Meyerhofer v. Empire Fire and Marine Insurance Co.*, 497 F.2d 1190 (2d Cir.), *cert. denied*, 419 U.S. 998, 95 S.Ct. 314, 42 L.Ed.2d 272 (1974), for example, purchasers of a stock offering brought a federal securities fraud action against various defendants, including an associate of the law firm which had represented the issuer. The lawyer prepared and presented an affidavit to the plaintiffs which detailed his conduct during the offering and which contained confidential information. The *Meyerhofer* court stated that the attorney's action in this respect was justified since the charge of a lawyer's knowing participation in the filing of a false and misleading registration statement was a serious one. In the case before us, the Pechner, Dorfman attorneys' charges were scarcely less serious. Therefore, on the strength of DR 4–101(C) and *Meyerhofer*, Mr. Rosen plainly could have argued to Judge Donnelly that the testimony otherwise precluded by the Company's invocation of the privilege should nonetheless have been admitted.[21]

---

**20.** *See supra* note 17 for a discussion of the nature of the ALJ's inferences.

**21.** *See also In re Friend*, 411 F.Supp. 776 (S.D.N.Y.1975) (allowing an attorney to turn over documents protected by the attorney-client privilege to a grand jury which was investigating his

D

In short, we conclude that Mr. Rosen and the Spector, Cohen firm should have withdrawn from their representation so Mr. Rosen (and other lawyers in the firm) could have become witnesses on behalf of their client concerning the events at the Locust Club meeting. They could then have intervened in the proceeding. While they would have enjoyed no due process right to offer evidence barred by the attorney-client privilege, they clearly could have argued that the privilege was inapplicable under the circumstances of this case. Having failed to avail themselves of these procedures, Mr. Rosen and his firm have no right now to a collateral hearing at variance with the orderly and sound procedures of administrative agency adjudication.

*Affirmed.*

client and the attorney). *District of Columbia Comm. on Ethics and Professional Responsibility Opinion No. 58* does not conflict with our conclusion that Mr. Rosen could have testified to information protected by the attorney-client privilege. *Opinion No. 58* merely refused to allow an attorney to turn over confidential information of clients when the allegations against him did not arise from his representation of these clients. In this case, the charges against Mr. Rosen clearly arose in the context of representing the Company.