Charles Patrick **CLARK**, Plaintiff,

v.

Drew **PEARSON**

and

the **Washington Post Company,** Defendants.

Civ. A. No. 710-62.

United States District Court District of Columbia.

Dec. 20, 1965.

See also D.C., 238 F.Supp. 495.

Warren E. Magee, Washington, D. C., for plaintiff.

John Donovan, Washington, D. C., for defendant Drew Pearson.

James H. McGlothlin and Michael S. Horne, Washington, D. C., for defendant The Washington Post Co.

Holtzoff, District Judge.

This action for libel is before the Court on the defendants' motions for summary judgment.

The plaintiff, Charles Patrick Clark, is a lawyer in active practice in Washington, D. C. One of his clients is the Government of Spain, from which he has been in receipt of a large annual retainer. Another client is a group of companies producing natural gas, whom the plaintiff represents in connection with legislative matters. The defendant, Drew Pearson, is a newspaper man, popularly known as a "columnist", who periodically writes articles or "columns" that appear under his own name in numerous newspapers throughout the United States. The defendant, The Washington Post Company, publishes a daily morning newspaper in Washington, D. C., called "The Washington Post".

This action is brought to recover damages for libel claimed to have been contained in a column written by the defendant Pearson and published in The Washington Post on December 1, 1961. In substance the article, after mentioning the plaintiff's profession and his clients, states that in 1949 the plaintiff and a member of the House of Representatives, whose name is given, became very friendly; that at about that time this Congressman reversed the position that he had taken previously in opposition to the "natural gas lobby"; that the Congressman became a champion of Franco and "littered" the Congressional Record with statements favorable to Spain; that he began to receive a series of checks from the plaintiff, which were listed as payments for legal advice in connection with a specific tax matter named in the article. The dates and the amounts of the checks are enumerated. It proceeds to state that the Congressman and the plaintiff were "quizzed" by the Federal Bureau of Investigation, and that thereafter the Congressman wrote to the plaintiff that his, the Congressman's, law firm was withdrawing from activity in the tax case.

It is claimed in behalf of the plaintiff that this article, in effect, charges him with having committed violations of the criminal law in endeavoring to influence the votes of a Member of Congress by paying him money. On the other hand, counsel for the defendants contend that no such charge is to be implied from the article and that the publication merely suggests at most an impropriety on the part of the Congressman and an activity of the plaintiff, which placed the Congressman in an indiscreet position.

The case was ably and comprehensively presented by counsel for all three parties. The arguments took a wide range and not only comprised a thorough discussion of the issues of fact and law actually involved in this litigation, but included also a plea for drastic changes in the law of libel, in a manner that would radically devitalize and impair the protection that it affords against defamatory publica-

tions. In view of this circumstance, it seems appropriate to make a few observations on the basic status of the law of libel in Anglo-American jurisprudence.

■ The common law sedulously guarantees to every individual various civil rights, such as the right of personal freedom, the right of personal safety, and the right of property. Another civil right safeguarded by the common law is the right to one's reputation. Although it is more intangible and more imponderable than the others, it is equally fundamental and vital, and its protection is equally efficacious and vigorous.

"The purest treasure mortal times afford

Is spotless reputation: that away, Men are but gilded loam or painted clay." [1]

The current trend in the law is to enhance and augment the protection of individual civil rights. No reason appears for making an exception as to the right to reputation. In fact the law of libel has been fortified by the recent development of the correlative right of privacy, Peay v. Curtis Pub. Co., D.C., 78 F.Supp. 305. The high regard accorded to the law of defamation is illustrated by the fact that in England, while trial by jury in civil cases has been largely abrogated since World War II, it is still preserved in its pristine vigor in connection with actions for libel or slander. The explanation given for this distinction is that most civil actions relate only to money, while actions for libel or slander involve honor and reputation, which are to be considered on a higher level.

■ Nevertheless, no one is accorded the privilege of maintaining a reputation to which he is not entitled. No one is granted a legal right to sail under false colors without molestation. Consequently the law does not afford any protection against the disclosure of truth, no matter how unpalatable or disagreeable it may be; no matter how unnecessary

its revelation; and no matter what the motive or purpose of the disclosure may be. Truth of a defamatory statement is always a complete defense to any action for libel or slander.

■ In this case the defendants interpose four defenses, each of which will be considered separately. The first defense is truth. Counsel for the defendant Pearson discussed separately and in detail each factual item contained in the article and convincingly demonstrated by reference to depositions, affidavits, and exhibits, that each individual statement was true and accurate. This approach, however, is inadequate. An accused publication must be read as a whole. Its content must be considered in its entirety and weighed in connection with its structure, nuances, implications and connotations. Washington Post Co. v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987. The proof of truth must be as broad as the alleged defamatory statement. It is not sufficient to take every sentence separately and demonstrate its individual accuracy, detached and wrenched out of its context.

■ The meaning of the article must first be determined, that is whether it charges violations of the criminal law, as claimed by the plaintiff, or whether it has a more innocent significance as contended by the defendants. If the former construction is to be attached to the publication, then proof of truth must comprehend a showing of criminality. While in a civil suit for libel, the truth of a charge of a crime need not be established beyond a reasonable doubt, as in a criminal prosecution, it must, nevertheless, be shown by a fair preponderance of the evidence. In that event the proof adduced by counsel for the defendant Pearson at this hearing would not be broad enough to constitute a complete justification. If the more innocent interpretation is to be placed on the article, the proof of truth may be sufficient. It follows hence that the first step to be taken is to determine what

1. Shakespeare, King Richard II, Act I, Scene 1, ls. 177–179.

the article means. The Court is of the opinion that it is susceptible of either one of the two meanings attributed to it by the parties.

■■ If an accused publication is unambiguous, its construction is a question of law for the Court. If, however, it is capable of two or more meanings, then the issue must be determined by the jury. It becomes the function of the jury to decide what the publication would mean to the ordinary man in the street, i. e., the average reader. In the case at bar this question, for the reasons stated, must be left to the jury, Washington Post Company v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448. In Curtis Publishing Co. v. Vaughan, 107 U.S. App.D.C. 343, 346, 278 F.2d 23, 26, the Court of Appeals for this Circuit said:

> "Where the meaning of the words of the publication is in dispute, an issue of fact arises and must be determined by the jury."

The Court of Appeals for the Second Circuit held to the same effect in Pauling v. News Syndicate Co., 335 F.2d 659, 663.

The instant case is distinguishable in principle from Dall v. Pearson, D.C., 246 F.Supp. 812, in which this Court granted the defendant's motion for summary judgment. In the Dall case the publication was unambiguous and the data submitted in support of the defense of truth completely demonstrated its accuracy.

■ The second defense adduced by the defendants is that the plaintiff consented to the publication. The basis for this contention is that the plaintiff extended to the defendant Pearson, or his representative, an opportunity to inspect his records, including cancelled checks and other documents, and that the factual data contained in the accused article were in fact obtained from the defendant's own file. At this stage of the litigation, the defense of consent has not been sufficiently made out. If the article should be construed by the jury as charging criminality, there was obviously no consent to its publication.

The third defense is a rather intriguing contention that the law of libel should be modified so as to grant immunity for publications of the type involved in this case, and to abrogate and destroy a large portion of the protection now accorded to persons who have been unjustly defamed. The starting point of this argument is found in two recent decisions of the Supreme Court. In the light of counsel's plea, they require detailed analysis. In undertaking it, we must resist a common temptation to read a judicial opinion as though it were a chapter in a treatise, and as though the text of the opinion expounded the law. We must adhere to the analytical process by which the common law grew from precedent to precedent. A judicial decision must be studied in connection with the salient facts on which it turned and must be limited to them. A rule of law that the case enunciates or applies must then be distilled by this method. While dicta may be treated with respect, they cannot be regarded as part of a statement of the law. Such an admonition was emphatically given by Chief Justice Marshall in Cohens v. Commonwealth of Virginia, 6 Wheat. 264, 398, 5 L.Ed. 257, in the following language:

> "It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision."

Two specific and narrow exceptions have been introduced into the right to recover damages for libel by recent decisions of the Supreme Court. While actually these two exceptions are not germane to the issues of this case, it is nevertheless, necessary to examine them, in view of the fact that they have served as a premise for a line of argument advanced by defendants' counsel at the hearing on these motions.

In Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434, and its companion case Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454, the Supreme Court carved out an exception for public utterances made by policy-making officials of the Federal Government in connection with their duties, and abrogated the right to recover damages for any defamatory assertions contained in such a statement. In each of these cases the Supreme Court reversed a judgment for the plaintiff in an action for libel brought against a high-ranking Federal officer. In the Barr case, the official involved was the Acting Director of the Office of Rent Stabilization. In the Howard case the defendant was the Commander of a Naval Ship Yard. There was no majority opinion in either case. Four justices concurred in an opinion, which advanced the doctrine that a policy-making official of the Federal Government should have the right, and at times even the duty, of making public statements concerning the operations of the Government agency for which he was responsible, and that, if in the course of such utterances anyone was defamed, there should be no liability for damages. Mr. Justice Black concurred in the reversal of the judgments, but on other grounds. There was an emphatic dissenting opinion by the Chief Justice, with whom Mr. Justice Douglas joined. There was a second dissenting opinion by Mr. Justice Brennan, and still another by Mr. Justice Stewart. It is interesting to observe that Mr. Justice Brennan in his dissenting opinion (p. 586, 79 S.Ct. p. 1347) expressed the view that, "the opinion must recognize the existence of the deep-rooted policy of the common law generally to provide redress against defamation". If the opinion of the four justices is to become law, it would carve out an exception from liability for libel for policy-making Federal officials in connection with public statements regarding the operations of their agencies. It would also detract from the fundamental principle of the common law that a Government officer or employee is liable for personal torts, even if committed in the course of performance of official duties. In this respect the common law differs from the law prevailing in some of the civil law countries. This relaxation of the law of libel manifestly does not extend to Government personnel generally but, as just stated, is limited to policy-making officials of Executive agencies. It by no means follows that every Government officer or employee may discuss the operations of the agency to which he is attached, with impunity and without any liability under the law of libel.

The Barr case arose in the District of Columbia and would modify the law of the District of Columbia, since this district is a Federal area. The Howard case originated in Massachusetts and holds that the liability of Federal officers is to be governed by Federal law and, therefore, alters the law applicable to Federal officers anywhere in the United States. These two decisions do not impinge on the law of any of the States and, therefore, do not affect the liability of State or local officers, outside of the District of Columbia.

The obverse was presented in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686. While the Barr case relates to liability of high executive Federal officers for libel, the Sullivan case deals with the opposite situation, namely, the right of superior officials who are in the public eye, to recover damages for libel. The Sullivan case holds that a high-ranking Government official, who is a public figure, is properly and freely subject to criticism by members of the public. He may not recover damages for libel in connection with such discussions, even for false statements of fact, unless actual malice is shown and it appears that the statement was made with knowledge of its inaccuracy, or with reckless disregard of its truth or falsity. It should be emphasized that this ruling is limited to high-ranking Government officials. It does not comprehend the entire Government personnel. The host of Federal, State, municipal and local government

administrators, scientists, lawyers, physicians, secretaries, clerks, inspectors of various kinds, policemen, firemen, letter carriers, mechanics, laborers, and others, are not affected and are not deprived of their rights under the law of libel. By entering Government employment, a person does not lose any of his civil rights. The exception is limited to high-ranking Government officers in order to secure the constitutional freedom for every citizen to discuss and criticize his Government.

That the ruling of the Supreme Court in the Sullivan case is limited to officials in the high echelons, is clearly demonstrated by a statement contained in the majority opinion of Mr. Justice Brennan in footnote 23 (376 U.S. p. 283, 84 S.Ct. p. 727):

> "We have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included. Cf. Barr v. Matteo, 360 U.S. 564, 573-575 [79 S.Ct. 1335]."

Only a short time previously Mr. Justice Brennan, in his dissenting opinion in the Barr case, supra, had emphasized the necessity of recognizing "the existence of the deep-rooted policy of the common law generally to provide redress against defamation". It is not likely that he would depart from views so strongly and firmly held by him. The Sullivan case arose in the State of Alabama. The New York Times had published a somewhat flamboyant full page advertisement inserted by a militant group. This advertisement, among other things, criticized the police force of Montgomery, Alabama, and contained certain false statements of facts, which if true, seriously reflected upon that police force. The advertising department of the Times did not check the accuracy of the advertisement, although the true facts were available in its news department. The plaintiff Sullivan was an elected Commissioner of Public Affairs in Montgomery.

His duties included the supervision of the Police Department. He brought an action for libel against the publisher of the New York Times, asserting that even though his name was not mentioned, nevertheless, the publication was libelous as to him, since he was responsible for the actions of the Police Department, and members of the public would construe the publication as referring to him. The local courts upheld this contention. The jury found for the plaintiff, and the judgment was affirmed by the Supreme Court of Alabama, 273 Ala. 656, 144 So.2d 25.

The Supreme Court of the United States was confronted by a somewhat baffling problem insofar as the facts of the case were concerned. The jury had rendered a grotesquely huge verdict for $500,000, although there was no contention that the plaintiff had suffered any pecuniary loss. It is a fair inference that the verdict was hardly the result of calm deliberation, but was the product of anger, hostility, or other emotions that should not invade a courtroom. Both the trial judge and the Supreme Court of Alabama declined to grant a new trial or order a remittitur. If the verdict had stood, it does not seem unreasonable to suggest that there would have been a miscarriage of justice. The law of libel is not to be perverted into a means for amassing wealth or distorted into an instrument for achieving financial independence. Its sole purpose is to afford a public forum for vindicating one's reputation and receiving some compensation for mental anguish, if no pecuniary loss is actually sustained. Neither is it the purpose of the law of libel to furnish a weapon for ruining a defendant. Mr. Justice Black in his concurring opinion in the Sullivan case (376 U.S. p. 294, 84 S.Ct. 710) points out that the half-million-dollar verdict gives dramatic proof that State libel laws may threaten the very existence of the press. He calls attention to the fact that numerous other suits of the same type were then pending against the

same newspaper publisher, asking a total of $5,600,000.

 To summarize the modifications in the law made by the Barr [2] and Sullivan cases, a policy-making Federal official is not liable for damages for any defamatory statements contained in his public utterances concerning the operations of the Government agency to which he is attached. On the other hand, a high-ranking public official in the public eye may not maintain an action for damages for libel, growing out of statements concerning the performance of his public duties unless actual malice is shown. The Barr and Howard cases are based on the common law and, therefore, the exception created by them changes only the Federal rule on the subject, i. e., the law of the District of Columbia and the law applicable to Federal officials generally. On the other hand, the Sullivan case is predicated on the constitutional right of freedom of speech and freedom of the press guaranteed by the First Amendment and, therefore, affects the law of the States as well as the Federal law. Subject to the two specific and narrow exceptions just summarized, the law of libel remains unmodified.

Counsel for the defendants in this case urge the Court, however, to apply the principle of the Sullivan case to all public figures or public persons, including those in private life, and to abrogate the limitation to public officials. In effect, they seek to transform two specific exceptions carved out by a process of erosion into an extensive demolition and destruction of the law by an act of avulsion. This Court perceives no reason in principle or in justice for radically undermining the law of libel, in this manner, nor does it find any precedents for doing so. The law of libel, as has been shown, is a vital and important aspect of the law of torts. It is one of the branches of law that safeguard individual civil rights. It should not be whittled away.

The basic philosophy underlying the doctrine of the Sullivan case is that the privilege of every citizen, no matter how well informed he may or may not be, to criticize his government freely, should be safeguarded, and that any obstacle or obstruction interfering with the exercise of this right should be removed as far as reasonably practicable. Such a right is regarded as indispensable in a popular form of government. It is deemed an essential element of the liberty of public debate. Manifestly this theory has no logical application to criticisms or attacks on private individuals. The fact that some persons are better known than some others should not lead to any far-reaching distinction in their civil rights. Consequently, there is no reasonable connection between a right to criticize one's Government and the right to disparage one's neighbors. To adopt the reasoning of defense counsel would not merely extend the rule of the Sullivan case unduly, but would introduce an entirely new and independent concept and inject an undesirable innovation into the law of defamation.

Counsel for the defendants cite a few isolated expressions that tend to support their views. There is, however, no controlling or binding authority to sustain them. On the other hand there are several decisions that have refused to succumb to the summons. It would serve no useful purpose to review the few expressions on either side, except to refer to the latest utterance on the subject in Fignole v. Curtis Pub. Co., 247 F.Supp. 595, decided by the United States District Court for the Southern District of New York on November 23, 1965, in which Judge McLean declines to take the step urged by counsel for the defendants here. He makes the following observations concerning the Sullivan case:

> "The rationale of that decision appears to be that since a public official enjoys a privilege, either absolute or qualified, against liability

---

2. To what extent the Barr case actually changes the law, is problematical because only four Justices joined in the opinion.

The question depends on whether the Court will in the future follow the ruling of the Barr case.

196

for libelous statements which he makes in the course of his official duties, so a critic of a public official's conduct should possess an equal privilege.

'It would give public servants an unjustified preference over the public they serve, if critics of official conduct did not have a fair equivalent of the immunity granted to the officials themselves.'" (376 U.S. 282–283 [84 S.Ct. 710]).

The fourth and last defense is the plaintiff's failure to plead special damages. It does not require lengthy consideration. The plaintiff obviously does not claim that he sustained any pecuniary loss by reason of the publication. He contends, however, that the article accuses him of a violation of the criminal law and is, therefore, libelous *per se*. If so, special damages need not be either alleged or proved. We, therefore, revert to the question as to what the article means. As heretofore shown, this issue should be resolved by the jury.

This Court concludes that the case at bar cannot be disposed of by a summary judgment and that a trial is needed for that purpose.

The defendants' motions for summary judgment are denied.