James COUGHLIN and
Patricia Coughlin

v.

**WESTINGHOUSE BROADCASTING
AND CABLE, INC.**

Civ. A. No. 83–0944.

United States District Court,
E.D. Pennsylvania.

Feb. 28, 1985.

Sarah M. Thompson, Philadelphia, Pa., for plaintiffs.

Jerome J. Shestack, Alan M. Lieberman, Janet S. Kole, Philadelphia, Pa., for defendant.

## OPINION

LUONGO, Chief Judge.

Plaintiffs James and Patricia Coughlin, a Philadelphia police officer and his wife, brought this defamation action because of a televised broadcast entitled "After Hours on American Street." The broadcast dealt with alleged official corruption in connection with a Philadelphia after hours club. KYW–TV (channel 3), a Philadelphia television station owned and operated by defendant Westinghouse Broadcasting & Cable, Inc., aired portions of the program on February 17, 18 and 19, 1982.

In 1981, KYW's investigative news team (the I-Team) received complaints concerning the Ukrainian-American Club on American Street in Philadelphia. According to local residents, the club's patrons were noisy and disruptive and the club consistently served liquor after 3:00 a.m., in violation of the Philadelphia Liquor Code. The residents charged that the Philadelphia police and the Liquor Control Board had ignored their complaints. Based on these reports, the I-Team began to investigate the club. The results of their investigation were broadcast in "After Hours on American Street." The program portrayed the activities which led to neighbors' complaints and reported that the investigation raised serious questions concerning whether members of the police department and the Liquor Control Board were doing their jobs. KYW reporter Stan Bohrman described a 1974 Pennsylvania Crime Commission report, which had concluded that Philadelphia's practice of using police officers to enforce the liquor laws with respect to private clubs fostered corruption. The I-Team, according to the program, had observed police activities on American Street similar to those described by the Crime Commission. The program illustrated this point with films taken outside the club on October 11, 1982, describing the filmed activity as "the most suspicious activity we saw on American Street." The films, accompanied by commentary, first showed police car 39 arriving at the club. An officer entered the club at 3:52 a.m. and left five minutes later. A number of people remained in the club. At 3:57 Officer Coughlin, who was driving car 35, reported over police radio that he was returning to headquarters for paperwork. The officer in car 39 returned to the club at 4:04 and left at 4:11 without recording the stop in his patrol log. Coughlin then drove car 35 to the club, backed up slowly, and drove away. Several minutes later car 35 returned. Coughlin entered the club and came out almost immediately, carrying an object in his hand. At this point, KYW stopped the film and showed Coughlin with a circle drawn around the object in his hand. The accompanying narrative stated: "As far as police radio knows, car 35 is still out at headquarters doing paperwork. Well, the only paperwork we saw him doing was carrying this envelope out of the club less than a minute after he went in. That officer is Patrolman James Coughlin." Elsewhere in the broadcast the narrative stated that an officer who stops without reporting his location over police radio "generally does not want it known that he's there."

KYW then showed film clippings of Coughlin refusing to be interviewed by I-Team reporters about the events described above and another incident on October 11. According to Mr. Bohrman, car 35 had arrived at the Ukrainian-American Club at

12:50 a.m. on October 11 in response to a vandalism complaint. The I-Team noted that when the officer returned from investigating the complaint he tried four times to find the right key to start the car. Because the officer was apparently unfamiliar with car 35, the I-Team conjectured that he was not Officer Coughlin. Coughlin's name was on the official report of the incident, however, and the patrol log recorded him as being in car 35 from 12:00 to 8:00 a.m., October 11. In conclusion, the program reported several other facts for which the I-Team could find no apparent explanation. Coughlin had entered the club at 4:17 a.m, without his standard patrol equipment consisting of nightclub, uniform jacket and hat. Car 35's official patrol log contained an unexplained gap for the period between 4:00 and 4:20 a.m., during which the I-Team had observed Coughlin on American Street. At 3:57, however, Coughlin had reported that he was returning to headquarters for paperwork.

Plaintiff James Coughlin alleges that this program defamed him by implying that he had engaged in corrupt activities and accepted a bribe from the Ukrainian-American Club. He claims the program placed him in a false light, invaded his privacy, and caused him severe emotional distress. Plaintiff Patricia Coughlin seeks damages for loss of her husband's society, companionship and consortium. Plaintiffs seek punitive as well as compensatory damages, alleging that defendant's conduct in airing the broadcast was outrageous.

Currently before me are plaintiffs' motion to compel defendant to answer certain interrogatories and deposition questions and defendant's motion for summary judgment. I will deal with the discovery motion

first, and then turn to the summary judgment motion.

## I.

Plaintiffs have moved for discovery with respect to the following: (1) portions of defendant's videotapes not included in the broadcast ("outtakes"); (2) facts supporting statements made in the broadcast and sources of those facts; (3) efforts made by defendant to verify its information; (4) defendant's editorial processes as to each statement; and (5) defendant's allegedly confidential sources. Defendant opposes plaintiffs' motion on the ground that the information sought is privileged under the Pennsylvania Shield Law, 42 Pa. C.S.A. § 5942(a).[1] Because I conclude that Pennsylvania law protects this information from discovery, I will deny plaintiff's motion to compel.[2]

Pennsylvania's shield law provides:

No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

42 Pa.C.S.A. § 5942(a). The Pennsylvania Supreme Court has held that the statute protects not only the identity of confidential sources but also *"documents,* inanimate objects *and all sources of information."* In re Taylor, 412 Pa. 32, 40, 193 A.2d 181, 185 (1963) (emphasis original).[3] The court reasoned that the shield law em-

---

**1.** Since the allegedly defamatory statements were broadcast in Pennsylvania and the alleged target is a Pennsylvania citizen, I see no reason to reject the parties' apparent assumption that Pennsylvania law applies in this diversity action. Under Fed.R.Evid. 501, therefore, questions of privilege must be determined in accordance with Pennsylvania law.

**2.** My decision to deny plaintiffs' motion is based on the privilege established by Pennsylvania's

shield law. I therefore need not determine whether the information requested is privileged under the First Amendment. *See Lal v. CBS, Inc.,* 726 F.2d 97, 100–01 (3d Cir.1984).

**3.** The decision in *Taylor* was based on an earlier version of the shield law. The current version, however, is "virtually identical" to the former statute. *Lal,* 726 F.2d at 100.

bodies a public policy supporting extensive protection of news sources. In order to effectuate that policy, the court declared, the law must be liberally interpreted in favor of the news media. *Id.* at 40–42, 193 A.2d at 185–86.

The Pennsylvania Supreme Court has recently asserted that the shield law gives media defendants extensive protection from discovery in civil libel cases. *Hepps v. Philadelphia Newspapers, Inc.,* — Pa. —, — — —, 485 A.2d 374, 386–87 (1984) (*Hepps II*). *Accord Lal v. CBS, Inc.,* 726 F.2d 97 (3d Cir.1984); *Steaks Unlimited v. Deaner,* 623 F.2d 264 (3d Cir.1980); *Mazzella v. Philadelphia Newspapers, Inc.,* 479 F.Supp. 523 (E.D.N.Y.1979) (applying Pennsylvania's shield law); *Hepps v. Philadelphia Newspapers, Inc.,* 3 Pa.D. & C.3d 693, 707 (C.P. Chester County 1977) (*Hepps I*) (*Taylor* "establishes the privilege against disclosure as absolute"). The Court of Appeals for the Third Circuit, recognizing the breadth of the Pennsylvania shield law, has held that unpublished portions of a filmed interview are privileged even though the identity of the primary source has been revealed. *Steaks Unlimited,* 623 F.2d at 279. The court reasoned that the shield law, as interpreted by *Taylor,* protects secondary as well as primary sources of news. A reporter need not show that unidentified secondary sources actually exist. Under *Taylor,* the statutory privilege applies whenever forced disclosure of an unpublished statement or "outtake" *may* reveal the identity of other sources. *Id.* (citing *Taylor,* 412 Pa. at 43, 193 A.2d at 186). The same reasoning mandates protection of a reporter's notes and resource materials from discovery. *Lal v. CBS, Inc.,* 726 F.2d at 100–01; *Mazzella v. Philadelphia Newspapers, Inc.,* 479 F.Supp. at 528–29.

Consistently with the liberal, pro-media approach required by *Hepps II* and *Taylor,* information concerning defendant's editorial processes must also be protected from discovery. To permit an inquiry into reporters' thought processes and methods of developing a news presentation would undermine the expansive protection which the shield law provides for newsgathering activities. As the New Jersey Supreme Court stated in holding editorial processes to be protected by a shield law similar to Pennsylvania's: "Discovery of editorial processes is especially threatening to newspersons because it inhibits the exchange of ideas that is crucial to the functioning of a free and vigorous press." *Maressa v. New Jersey Monthly,* 89 N.J. 176, 188, 445 A.2d 376, 383, *cert. denied,* 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982).

■ Plaintiffs challenge the validity of the shield law under both the Pennsylvania and United States Constitutions. Plaintiffs cite Pa. Const. art. V, § 10(c), which authorizes the Pennsylvania Supreme Court "to prescribe general rules governing practice, procedure and the conduct of all courts." Characterizing the shield law as a rule of evidence and thus as procedural, plaintiffs contend that the legislature unconstitutionally usurped judicial power by enacting the law. Under Pennsylvania law, however, the legislature may "create or alter rules of evidence." *Rich Hill Coal Co. v. Bashore,* 334 Pa. 449, 485, 7 A.2d 302, 319 (1939). *See also Phillips v. Unemployment Compensation Board of Review,* 152 Pa.Super.Ct. 75, 82, 30 A.2d 718, 723 (1943); *Williams v. American Broadcasting Cos.,* 96 F.R.D. 658, 666 (W.D.Ark.1983) (it is well established that recognition of a journalist's privilege is for the legislature.) If I were to accept plaintiffs' argument, I must invalidate Pennsylvania's longstanding practice of establishing rules of evidence and privilege by legislative action. I will not interpret Pennsylvania's constitution to require such a result.

■ Plaintiffs also argue that the shield law, as defendant interprets it, violates the due process guarantees of the Pennsylvania and United States Constitutions. Under the Pennsylvania constitution, protection of one's reputation is a fundamental right. Pa. Const. art. I, § 1.[4] Although

4. Section 1 provides: "All men ... have certain

inherent and indefeasible rights, among which

the constitution guarantees freedom of speech, it provides that a citizen is "responsible for the abuse of that liberty." *Id.* § 7. The state's due process clause specifically provides for vindication of reputational interests in the courts: "All courts shall be open; and every man for an injury done him in his ... reputation shall have remedy by due course of law." *Id.* § 11.

Plaintiffs note that in order to prevail in this lawsuit they must prove defendant published false statements with "actual malice."[5] They claim that if they are barred from investigating defendant's outtakes, sources and editorial processes, they will be prevented from satisfying their heavy burden. Thus, they claim, the shield law in effect makes it impossible for libel victims to recover and grants the media an absolute license to defame. They urge that such a result cannot be reconciled with the Fifth and Fourteenth Amendments to the United States Constitution or with Pennsylvania's constitutional right to vindicate one's reputation in the courts.

The Third Circuit has rejected the argument that a privilege which limits a plaintiff's ability to uncover evidence in a defamation case deprives him of access to the courts. *Samuelson v. Susen,* 576 F.2d 546, 553 (3d Cir.1978). In *Samuelson,* plaintiff was allegedly defamed during a medical review committee's proceedings. Such proceedings were privileged under an applicable Ohio statute. Plaintiff argued that the statute violated his Fifth and Fourteenth Amendment due process rights by depriving him of information central to his cause of action and in effect denying him access to the courts. *Id.* at 552. The Third Circuit upheld the state legislature's right to establish privileges in order to further important public interests. The court stated: "No doubt the statutory provisions affect the manner in which plaintiff may

develop evidence to support his defamation claim. Plaintiff is not, however, foreclosed from prosecuting his claim with other evidence, both direct and circumstantial." *Id.* at 553. Plaintiff's due process argument, according to the court, was "attenuated." *Id.* Similarly, the Court of Appeals for the District of Columbia Circuit has held that there is "no due process right to offer evidence barred by the attorney-client privilege," even if the evidence is necessary to establish a defamation claim. *Rosen v. NLRB,* 735 F.2d 564, 577 (D.C.Cir.1984). The court reasoned:

> The attorney-client privilege is but one of several privileges that prevent parties themselves from adducing particular evidence, and thus create an obstacle to fact finding due to the broad judgment that the value of introducing such evidence is outweighed by the harm inflicted upon other policies and values. The explicit burdens imposed by such evidentiary rules have never, to our knowledge, been held inconsistent with due process in the civil law context, because such burdens are simply a necessary consequence of society's attempt to balance the value of the complete admissibility of probative evidence with other competing values, such as the protection of vital professional or associational relationships.

*Id.* at 572. *See also Branzburg v. Hayes,* 408 U.S. 665, 706, 92 S.Ct. 2646, 2669, 33 L.Ed.2d 626 (1972) (states may recognize a journalist's privilege, "either qualified or absolute").

The fact that protection of reputation is a fundamental right in Pennsylvania does not change the result. The supreme court of Pennsylvania, recognizing that even constitutional rights are subject to limitations, has held that certain public officials are absolutely immune from liability for defa-

---

are those of ... acquiring, possessing and protecting property and reputation."

**5.** *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), requires proof of actual malice because, as I conclude in the second section of this opinion, plaintiff James Coughlin is a public official.

If Coughlin were not a public official for *New York Times* purposes, as plaintiffs contend, plaintiffs concede that they must prove malice in order to recover punitive damages. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349–50, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974).

mation. *Matson v. Margiotti*, 371 Pa. 188, 88 A.2d 892 (1952). According to the court:

[N]either freedom of speech nor freedom to protect one's property and reputation—each of which is guaranteed by the [Pennsylvania] Constitution—is unlimited, and it is obvious that they must sometimes be competing and conflicting.... Even though the innocent may sometimes suffer irreparable damage, it has been found to be in the public interest and therefore sounder and wiser public policy to "immunize" public officials [from liability for defamation].

*Id.* at 202–03, 88 A.2d at 899. *See also Hepps v. Philadelphia Newspapers, Inc.,* — Pa. —, —, 485 A.2d 374, 380 (1984). The Third Circuit in *Steaks Unlimited v. Deaner,* 623 F.2d 264, 277 n. 62 (3d Cir. 1980), recognized that by protecting a media defendant's outtakes from discovery it was depriving the plaintiffs of important evidence. The court held, however, that it was bound by the Pennsylvania legislature's decision to provide broad protection to news sources. *Id.* at 279. According to the court, "to the extent a state chooses to authorize a cause of action for defamation, it may also limit the plaintiff's ability to prove his claim in order to promote other social purposes." *Id.* at 279 n. 74.

Pennsylvania, like other jurisdictions, has established a number of conditional and absolute privileges applicable in defamation actions. Plaintiffs would have me second-guess the state's policy decisions and strike down an entire class of laws on the basis of an argument which the Third Circuit has characterized as "attenuated." I decline to do so.

Under Pennsylvania's shield law, defendant cannot be compelled to disclose information concerning outtakes, sources, or editorial processes. Plaintiffs also seek discovery with respect to the factual bases for the broadcast and defendant's efforts to verify its information. A review of the exhibits to plaintiffs' memorandum shows that plaintiffs have requested, and defendant has supplied, extensive material concerning defendant's investigation and the bases for the allegedly defamatory statements. Plaintiffs have not identified any specific factual information, other than that protected by the shield law, which defendant has failed to provide. Accordingly, plaintiffs' motion to compel discovery must be denied.

## II.

Defendant Westinghouse has moved for summary judgment, claiming that the allegedly defamatory statements are not actionable and that plaintiffs cannot prove actual malice. Defendant's memorandum of law analyzes the broadcast statement by statement, purporting to show that the broadcast consisted of indisputably true statements, videotapes of actual occurrences, and protected expressions of opinion. In particular, Westinghouse defends the statement that Coughlin was carrying an envelope as an expression of I-Team reporters' subjective opinion. Defendant claims plaintiffs have produced no evidence from which it can be inferred that any KYW employee did not believe the statements in the broadcast to be true. Plaintiffs cannot, therefore, prove that defendant published the allegedly defamatory statements with "actual malice."

Plaintiffs claim that defendant has attempted to disguise the defamatory impact of the broadcast as a whole by analyzing each statement apart from its context. According to plaintiffs, the film segments and accompanying narrative defamed Officer Coughlin by strongly implying that he had accepted a bribe. Plaintiffs also assert that Coughlin is not a "public official" for the purposes of *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and thus need not prove malice in order to prevail. Plaintiffs argue, however, that the record contains ample evidence of malice. They claim that I-Team reporters were hostile toward the police because of earlier confrontations between members of the I-Team and the police department, and that the investigation on American Street arose from a desire to discover official corruption. Reporters

filmed police activities which could conceivably be interpreted as suspicious, and developed a broadcast on the basis of those activities. Although the I-Team's observations were made in October of 1981, and the broadcast was not aired until February of 1982, plaintiffs claim reporters made no realistic effort to determine whether innocent explanations existed for the videotaped activities. Plaintiffs also assert that the I-Team, in developing the broadcast, relied solely upon sources biased against the police and the Ukrainian-American Club.

Plaintiffs claim that a minimal investigation would have revealed that on October 11, 1981, Officer Coughlin was a rookie policeman patrolling alone for the first time. Early in his shift, he was ordered to investigate a vandalism complaint at the Ukrainian-American Club. After talking to the club's steward, he returned to his patrol car and filled out a "48" book, used by police to file incident reports. He attributes his difficulty in starting the car to the fact that he had never driven a patrol car before that night. Plaintiffs object to the broadcast statement that the officer in car 35 did not appear to be Coughlin. According to plaintiffs, this statement implied that Coughlin had someone else surreptitiously take his place and fill out his reports while he was somewhere else, perhaps inside the club.

At approximately 2:45 a.m. on October 11, Coughlin was ordered to check several private clubs outside his assigned patrol area to ensure compliance with city liquor laws. He had never performed a club check before, and one of his fellow officers had to explain his duties to him in detail. At 3:57, after checking the clubs, he reported over police radio that he was returning to headquarters. He then turned in his club check reports at headquarters and was sent to determine whether the Ukrainian-American Club had already been checked by another officer. Coughlin explains the events which the I-Team described as "suspicious" as follows: When he arrived at American Street, he saw another police officer driving away. He followed in order to ask whether the officer had checked the Ukrainian-American Club. After losing sight of the patrol car, he returned to the club. He went inside, learned that another officer had just checked the club, and left immediately. He claims that the object in his hand was a 48 book. He also asserts that the officers in his district were not required to wear uniform jackets that night.

Coughlin describes the I-Team's attempt to interview him on February 10, 1982, as an "ambush." According to Coughlin, when he returned from work early that morning two men confronted him outside his house. One was operating a television camera and the other began to question Coughlin about his activities on October 11, 1981. Coughlin claims he was unnerved by the camera and by the abrupt questioning. The reporters refused to turn the camera off, and Coughlin therefore refused to answer their questions.

In order to be entitled to summary judgment, defendant must show that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The first question presented by defendant's summary judgment motion is whether the challenged statements are capable of a defamatory meaning. Under Pennsylvania law, "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971) (quoting Restatement of Torts § 559 (1938)). The allegedly defamatory statements must be read in context:

The test is the effect the [communication] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them.

*Id.* at 447, 273 A.2d at 907 (quoting *Boyer v. Pitt Publishing Co.*, 324 Pa. 154, 157, 188 A. 203, 204 (1936)). *Accord Marcone v. Penthouse International*, 754 F.2d 1072, 1078 (3d Cir.1985).

■ Defendant's broadcast is clearly capable of a defamatory meaning. The broadcast outlined the apparent law enforcement problems on American Street and, quoting a 1974 Pennsylvania Crime Commission Report, characterized the situation as "ripe for corruption." The narrator described the police activities filmed on October 11, 1981, as "the most suspicious activity we saw on American Street." The subsequent films and descriptions of Officer Coughlin, considered in the context of the entire broadcast, are reasonably susceptible to the interpretation that Coughlin accepted a bribe. The I-Team's presentation of its attempt to interview him reinforced the implication that he was evasive and therefore guilty of corrupt activities. Because I conclude that the broadcast is capable of a defamatory meaning, it would be for a jury to determine whether that meaning was conveyed to the broadcast's audience. *Corabi*, 441 Pa. at 442, 273 A.2d at 904.

■ Defendant also seeks summary judgment on the ground that the broadcast was substantially true. Defendant argues that each allegedly defamatory statement was either true or a protected expression of opinion. Under Pennsylvania law, however, allegedly defamatory words must be read in context. *Pierce v. Capital Cities Communications, Inc.*, 576 F.2d 495, 502 (3d Cir.), *cert. denied*, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978). The literal accuracy of individual statements will not insulate a defendant from liability where the overall impression left by those statements is false. According to the

Pennsylvania Superior Court, " 'true facts' that in context imply a falsehood are, in an action for defamation, not 'true.' " *Dunlap v. Philadelphia Newspapers, Inc.*, 301 Pa.Super.Ct. 475, 491, 448 A.2d 6, 15 (1982). Thus, it is not sufficient for defendant " 'to take every sentence separately and demonstrate its individual accuracy, detached and wrenched out of context.' " *Id.* at 493, 448 A.2d at 15–16 (quoting *Clark v. Pearson*, 248 F.Supp. 188, 191 (D.D.C.1965)).

■ I have already determined that the broadcast can reasonably be construed as implying that Officer Coughlin was involved in corrupt activities. Plaintiffs have presented evidence, including the affidavit of Coughlin himself and the testimony of other police officers, that this implication was false. Defendant has not seriously challenged plaintiffs' explanation for the events of October 11, 1981. In fact, on February 20, 1982, KYW aired a follow-up program during which the president of the Fraternal Order of Police presented Coughlin's version of those events. I conclude that there is a genuine issue of fact concerning the truthfulness of those segments of the broadcast dealing with Coughlin.[6]

Defendant's final argument is that plaintiffs must show "actual malice" on its part in order to prevail. Defendant contends that the record contains no evidence of malice, and that it is therefore entitled to summary judgment. Plaintiffs claim that Officer Coughlin, the target of the alleged defamation, is not a public official required to prove malice under *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964).

■ Courts have consistently treated police officers as public officials within the meaning of *New York Times*. *See, e.g., Time, Inc. v. Pape*, 401 U.S. 279, 284, 91

---

**6.** The Pennsylvania Supreme Court has recently held, in a defamation case involving a private figure plaintiff, that the defendant bears the burden of proving an allegedly defamatory statement to be true. *Hepps v. Philadelphia Newspapers, Inc.*, —— Pa. ——, 485 A.2d 374 (1984). Although it is arguable that *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), requires the plaintiff, at least when plaintiff is a public official or public figure, to bear the burden of proving falsity, I need not decide the issue at this time. Regardless of which party bears the burden of proof, there is a genuine issue of fact as to the truth or falsity of the broadcast.

S.Ct. 633, 636, 28 L.Ed.2d 45 (1971); *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Henry v. Collins,* 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965); *Cibenko v. Worth Publishers,* 510 F.Supp. 761, 765 (D.N.J.1981); *Dunlap v. Philadelphia Newspapers, Inc.,* 301 Pa.Super.Ct. 475, 493–94, 448 A.2d 6, 16 (1982). Police officers qualify as public officials because:

> They "have or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs," ... and their position "has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees...." ...
> The cop on the beat is the member of the department who is most visible to the public. He possesses both the authority and the ability to exercise force. Misuse of his authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss. The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant the conclusion that he is a public official.

*Gray v. Udevitz,* 656 F.2d 588, 591 (10th Cir.1981) (quoting *Rosenblatt v. Baer,* 383 U.S. 75, 85–86, 86 S.Ct. 669, 675–76, 15 L.Ed.2d 597 (1966)) (citations omitted).

■ Officer Coughlin is a public official[7] and the broadcast related to his official conduct. Plaintiffs must therefore prove that defendant aired the broadcast with "actual malice," that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726.

Plaintiffs argue that the I-Team's hostility toward the police, its reliance on biased sources and its failure to investigate establish the existence of actual malice. Viewing the evidence in the light most favorable to plaintiffs, as I must under Fed.R.Civ.P. 56, I agree that defendant's reporters showed little concern for the truth when they developed "After Hours on American Street." I cannot conclude, however, that plaintiffs have set forth sufficient evidence of malice to withstand defendant's motion for summary judgment.

■ Under *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the evidence must "permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publication." (Emphasis added.) Malice cannot be inferred from a reporter's general hostility toward or bias against a subject.[8] *National Association of Letter Carriers v. Austin,* 418 U.S. 264, 281, 94 S.Ct. 2770, 2779, 41 L.Ed.2d 745 (1974) ("hatred, spite, ill will, or desire to injure" is not an element of the malice required by *New York Times*); *Rebozo v. Washington Post Co.,* 637 F.2d 375, 380 (5th Cir.), *cert. denied,* 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379 (1981). Absent a showing of reckless indifference to the truth, evidence that an investigation was "designed to confirm a hostile premise rather than to find the truth" does not establish malice. *Westmoreland v. CBS Inc.,* 596 F.Supp. 1170, 1173 (S.D.N.Y. 1984). *Accord Herbert v. Lando,* 596

---

7. Plaintiffs, relying upon *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), argue that Coughlin is not a "public official" because he did not thrust himself into a public controversy and does not have significantly greater access to the media than a private citizen has. Under *Gertz,* however, those factors are relevant only to the question of whether a plaintiff who does not qualify as a public official is a "public figure." *Id.* at 351–52, 94 S.Ct. at 3012–13. Because I conclude that Coughlin is a public official under *New York*

*Times,* I need not reach the question of whether he is a public figure.

8. Even if hostility were a factor in determining malice, I perceive little, if any, evidence in the record that the I-Team's investigation was motivated by ill will. Plaintiffs' claim that hostility existed is undercut by the consistent testimony of both KYW personnel and police officers that, despite occasional differences of opinion, the relationship between KYW and the police department was basically amicable.

F.Supp. 1178, 1224–26 (S.D.N.Y.1984). As Judge Leval noted in *Westmoreland,* "[r]eporters of course investigate where their suspicions lie. A previously formed belief rebuts as much as it establishes constitutional malice, as it tends to demonstrate sincerity." 596 F.Supp. at 1174. Evidence of failure to investigate, even if it establishes that defendant was indifferent to the truth of an allegedly defamatory communication, is also insufficient to show that defendant acted with malice. *St. Amant,* 390 U.S. at 733, 88 S.Ct. at 1326; *Marcone v. Penthouse International,* 754 F.2d 1072, 1089–1090 (3d Cir.1985); *Dickey v. CBS, Inc.,* 441 F.Supp. 1133, 1141 (E.D. Pa.1977), *aff'd,* 583 F.2d 1221 (3d Cir.1978).

Defendant's employees, by affidavit and in deposition testimony, assert that the allegedly defamatory statements consisted of inferences drawn from observed facts and accurate reports of complaints made by the Ukrainian-American Club's neighbors. They claim they honestly believed the officer who dealt with the club's vandalism complaint at 12:50 a.m. on October 11, 1981, was not Coughlin, and that the object in Coughlin's hand when he left the club shortly after 4:00 a.m. was an envelope. In addition, they claim that they merely presented their perceptions as to the facts, and left the audience to draw its own conclusions based upon the film clippings and accompanying narrative.[9]

 The absence of intent to defame, of course, does not shield a defendant from liability for defamation. *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326. Moreover, a jury could clearly find that the I-Team was at least aware that the broadcast could be interpreted as implicitly accusing Coughlin of corrupt activities. The

evidence which would support such a finding, however, would not support a finding that defendant's employees did not believe their implicit accusations were true, or that they acted with reckless disregard for the truth. Plaintiffs have not set forth evidence sufficient to create an issue as to whether defendant's statements were "so inherently improbable that only a reckless man would have put them in circulation." *Id.* In fact, the evidence relevant to the state of mind of defendant's employees indicates that, although they did not seriously explore other possible explanations for Coughlin's behavior, the conclusions which they drew based on their observations were reasonable.

The I-Team's investigation began as the result of persistent complaints concerning illegal and disruptive activities at the club. Reporters observed activities which they felt were inconsistent with proper law enforcement. Their suspicions were reinforced by a 1974 Pennsylvania Crime Commission report, which noted the potential for corruption that exists when police officers monitor private clubs. Barbara Bailey, an attorney who supervised the Crime Commission's 1974 investigation, confirmed that the activities shown in the I-Team's videotapes were similar to activities which had raised the Crime Commission's suspicions in 1974.

Representatives of the Philadelphia Police Department also agreed that the activities videotaped on October 11 raised questions concerning whether the police officers involved were performing their duties. Deputy Police Commissioner Robert Armstrong was sufficiently concerned with the possibility of corruption that he ordered an internal investigation of Coughlin's activi-

---

9. *See* Deposition of Pasquale L. Polillo at 85–87 (May 3, 1984). Polillo, the General Manager of KYW–TV, gave final approval to the broadcast. Plaintiffs contend that Polillo admitted defendant knew the broadcast's implications concerning Coughlin were false, but aired the broadcast for the sake of "impact." I have reviewed Polillo's testimony and find no support for plaintiffs' interpretation. Polillo testified that he had not felt it necessary to verify what was in Coughlin's hand, because the public could "make up its

own mind" concerning what the videotape showed. He also stated, however, that he had had no basis for suspecting anything in the broadcast to be inaccurate, and that he had personally believed that Coughlin was holding an envelope. Although Polillo's remarks may show that defendant did not conduct a thorough investigation, they cannot reasonably be construed to show that defendant acted with reckless disregard of the truth.

ties. Commissioner Armstrong testified at his deposition that he personally believed the I-Team's films showed Coughlin with a 48 book in his hand. He stated, however, that it was not unreasonable to conclude that the object in Coughlin's hand was an envelope. In fact, he noted that the police department, after conducting interviews and laboratory tests and consulting with the FBI, had been unable to reach an official conclusion concerning the object's identity. In addition, Commissioner Armstrong, together with other members of the Philadelphia Police Department, testified that Coughlin had not followed department procedures with respect to his log book entries and his uniform.

As I have already determined, a jury could find that Coughlin's actions were due to inexperience, not corruption. An issue also exists as to whether the I-Team, with a minimum of effort, could have discovered the truth. The Supreme Court's mandate, however, is clear: "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731, 88 S.Ct. at 1325. The evidence in this case would not support a finding that the I-Team's interpretation of Coughlin's behavior as indicative of corruption was so unreasonable as to give rise to an inference of actual malice. *See Marcone*, at 1091 (actual malice not shown when "mistakes appear to be the result of insufficient editorial verification and checking procedures, but not of a conscious decision to present [plaintiff] in a false light.") The fact that the broadcast was not "hot news" and defendant had time to investigate is not sufficient to demonstrate the existence of malice. *See Dickey v. CBS, Inc.*, 583 F.2d 1221, 1228 n. 9 (3d Cir.1978); *Barger v. Playboy Enterprises*, 564 F.Supp. 1151, 1156 (N.D.Cal.1983), *aff'd mem.*, 732 F.2d 163 (9th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 175, 83 L.Ed.2d 110 (1984). The Supreme Court in *St. Amant v. Thompson*, 390 U.S. at 731–32, 88 S.Ct. at 1326, noted that its definition of malice as subjective awareness of falsity:

may be said ... [to] put[ ] a premium on ignorance, encourage[ ] the irresponsible publisher not to inquire, and permit[ ] the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.

I note that the parties have presented opposing viewpoints as to the propriety of granting summary judgment where the presence of "actual malice" is at issue. Defendant argues that, because interests protected by the First Amendment are at stake, summary judgment is particularly appropriate. Defendant quotes *Bose Corp. v. Consumers Union*, — U.S. —, —, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984):

The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

Plaintiffs rely upon *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675,

2680 n. 9, 61 L.Ed.2d 411 (1979), for the proposition that "proof of 'actual malice' calls a defendant's state of mind into question ... and does not readily lend itself to summary disposition."

I am not persuaded that the special proof requirements enunciated in *Bose* should apply at the summary judgment stage. *Bose* dealt with the function of an appellate court reviewing a finding of actual malice in a defamation case. The Supreme Court held that the sensitive constitutional interests at stake necessitated stringent and independent appellate review. The court's role is different at the summary judgment stage, which involves a preliminary inquiry into whether a plaintiff has raised triable issues of fact. Plaintiffs should not be compelled in effect to prove their entire case before trial. *See Liberty Lobby, Inc. v. Anderson,* 746 F.2d 1563, 1570–71 (D.C. Cir.1984).

The question remains, however, whether under *New York Times Co. v. Sullivan* I must consider even the preliminary matter before me in light of plaintiff's ultimate burden of proof. *See* 376 U.S. at 285–88, 84 S.Ct. at 728–30 (public official plaintiff must prove malice with "convincing clarity;" evidence which would support a finding of negligence may be insufficient to support a finding of actual malice). A number of courts have held that the degree of evidence which plaintiffs must present will affect defendant's ability to show, as required by Fed.R.Civ.P. 56, that no genuine issues of material fact exist. Under this approach, the propriety of granting summary judgment depends upon whether, "viewing the evidence and all inferences arising therefrom in the light most favorable to the plaintiff, there appears a genuine issue of fact from which a jury could reasonably find actual malice with convincing clarity." *Brophy v. Philadelphia Newspapers, Inc.,* 281 Pa.Super.Ct. 588, 601, 422 A.2d 625, 632 (1980). *Accord Yiamouyiannis v. Consumers Union,* 619 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980); *Bryant v. Associated Press,* 595 F.Supp. 814, 818 (D.V.I.1984); *Nader v. de Toledano,* 408 A.2d 31, 49–50 (D.C.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

 It is difficult to determine from the single footnote in *Hutchinson v. Proxmire,* 443 U.S. at 120 n. 9, 99 S.Ct. at 2680 n. 9, how the Supreme Court will ultimately decide this issue. I interpret that footnote, however, as indicating that courts should not form what amounts to a presumption favoring summary judgment in order to protect a defendant's First Amendment rights. *See Steaks Unlimited v. Deaner,* 623 F.2d 264, 275 n. 56 (3d Cir.1980). I do not believe that the Supreme Court intended to preclude the use of summary judgment, when appropriate under a neutral application of Rule 56, to dispose of "potentially frivolous suits that threaten First Amendment freedoms." *Brophy,* 281 Pa. Super.Ct. at 599, 422 A.2d at 631. Defendant Westinghouse has shown, as required by Rule 56, that no genuine issues of material fact exist. I will therefore grant defendant's motion for summary judgment.

 Defendant is also entitled to summary judgment with respect to plaintiffs' remaining claims. Because Coughlin is a public official, plaintiffs must prove malice on defendant's part in order to prevail on their claim that the broadcast portrayed Coughlin in a false light. *See Time, Inc. v. Hill,* 385 U.S. 374, 390, 87 S.Ct. 534, 543, 17 L.Ed.2d 456 (1967); *Goldman v. Time, Inc.,* 336 F.Supp. 133, 137–38 (N.D.Cal. 1971); Restatement (Second) of Torts § 652E(b) & comment d (1977). My determination that the evidence would not support a finding of malice requires that I grant summary judgment as to plaintiffs' false light claim. Plaintiffs' claim for punitive damages falls on the same basis. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349–50, 94 S.Ct. 2997, 3011–12, 41 L.Ed.2d 789 (1974) (plaintiff must prove malice in order to recover punitive damages). Similarly, I do not perceive sufficient evidence to support plaintiffs' claim that defendant is liable for intentional infliction of emotional distress. Liability for emotional dis-

tress can be found "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 comment d (1977). Even proof of malice or intent to inflict emotional distress is an insufficient basis for liability. Because the evidence would not support a finding that defendant's conduct was extreme or outrageous, I must grant summary judgment as to plaintiffs' claim for emotional distress. *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1274 (3d Cir.1979).

▮ Defendant has also demonstrated that no genuine issue of fact exists with respect to plaintiffs' claim for invasion of privacy. Under Pennsylvania law, an invasion of privacy action can be brought on any one of four grounds: "(1) intrusion upon seclusion, (2) appropriation of name or likeness, (3) publicity given to private life, and (4) publicity placing a person in a false light." *Martin v. Municipal Publications*, 510 F.Supp. 255, 259 (E.D.Pa. 1981). *Accord Vogel v. W.T. Grant Co.*, 458 Pa. 124, 129 n. 9, 327 A.2d 133, 136 n. 9 (1974). Plaintiffs allege that defendant's broadcast is actionable on the third and fourth grounds. I have already determined that plaintiffs' false light claim is not viable. Plaintiffs' claim that defendant publicized Coughlin's private life must also fall, because the broadcast dealt with Coughlin's public activity as a police officer. A police officer's on-the-job activities are matters of legitimate public interest, not private facts. A publication dealing with those activities thus cannot be the basis for an invasion of privacy action. *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492–95, 95 S.Ct. 1029, 1044–46, 43 L.Ed.2d 328 (1975); Restatement (Second) of Torts § 652D & comments b, d (1977).

▮ Finally, because I have determined that James Coughlin has no viable claim against defendant, Patricia Coughlin's derivative claims must also fall. A wife's claim for loss of her husband's consortium depends upon proof that an actionable wrong was committed against her husband. *Little v. Jarvis*, 219 Pa.Super.Ct. 156, 162, 280 A.2d 617, 620 (1971). *See also Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 574 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Defendant is therefore entitled to summary judgment with respect to Patricia Coughlin's claims.

### III.

The task of balancing plaintiffs' interest in vindicating James Coughlin's reputation against defendant's First Amendment rights is a difficult one. With respect to plaintiffs' discovery motion, however, the balance has already been struck in defendant's favor by the Pennsylvania Shield Law. Because of the broad privilege which the shield law grants to media defendants in defamation cases, I must deny plaintiffs' motion to compel discovery. Moreover, I am constrained under recent Supreme Court and Third Circuit precedent to conclude that no genuine issues of fact remain in this case and that defendant is entitled to a judgment as a matter of law. I will therefore grant defendant's motion for summary judgment.